UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TIMOTHY O'NEILL,

          Plaintiff,                         Hon. Ellen S. Carmody

v.                                         Case No. 1:16-cv-1061

UNUM LIFE INSURANCE
COMPANY OF AMERICA,

          Defendant.

_____/


## OPINION

This matter is before the Court on Plaintiff's challenge to Defendant's decision denying his application for disability benefits pursuant to a group long term disability policy. The parties have consented to proceed in this Court for all further proceedings, including trial and an order of final judgment. 28 U.S.C. § 636(c)(1). By Order of Reference, the Honorable Janet T. Neff referred this case to the undersigned. The Court has determined that oral argument is unnecessary. For the reasons discussed herein, Plaintiff's appeal is **denied** and this matter **terminated**.


## BACKGROUND[1]

As of April 2013, Plaintiff had "an extensive past medical history of alcoholism and depression with previous suicide attempts." (ECF No. 17-8 at PageID.1807; ECF No. 17-10

---

[1] Given the sheer volume of material included in the administrative record, its puzzling organization, and the duplication (oftentimes several times over) of much of the contents, the Court requested that the parties jointly compile a more focused supplement to the Administrative Record to aid the Court in its review. (ECF No. 30). The supplement the parties prepared, which also includes the citations to the official Administrative Record, has proven quite helpful in ensuring that all the relevant information is properly considered. To avoid any confusion, however, the citations to the Administrative Record herein, consistent with the parties' briefing, are to the official Administrative Record. (ECF No. 17-19).

at PageID.2165).   On April 15, 2013, Plaintiff, after having "a few drinks," fell and suffered a head injury which required hospitalization.   (ECF No. 17-4 at PageID.608-12).   Plaintiff subsequently returned to work, but again attempted suicide on September 15, 2013.   Shortly thereafter, Plaintiff submitted a disability claim pursuant to a group long term disability policy issued by Defendant (hereinafter "the Policy").   Plaintiff alleged that due to a hearing-related injury suffered as a result of his April 15, 2013 injury, he was no longer able to perform his duties as an anesthesiologist.   Defendant paid Plaintiff disability benefits for a period of time after which it terminated Plaintiff's benefits pursuant to a policy provision that limits disability benefits "due to mental illness" to twenty-four (24) months.   Plaintiff's appeal of this determination was rejected by Defendant prompting the present action.

## LEGAL STANDARD

The parties have stipulated that the de novo standard of review applies in this matter, pursuant to which the Court's role "is to determine whether the administrator. . .made a correct decision."   *Ross v. Reliance Standard Life Ins. Co.*, 112 F.Supp.3d 620, 622 (W.D. Mich. 2015) (citations omitted).   The Court's review is limited to the record that was before the administrator whose decision is accorded neither deference nor presumption of correctness.   In sum, the Court "must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan."   *Ibid* (citations omitted).

## ANALYSIS

I.          Relevant Policy Language

The Policy provides that a claimant is disabled if Unum determines that: (1) you are "limited from performing the material and substantial duties of your regular occupation due to

your sickness or injury" and (2) you experience "a 20% or more loss in your indexed monthly earnings due to the same sickness or injury." (ECF No. 17-2 at PageID.123). The Policy defines "regular occupation" as follows:

> REGULAR OCCUPATION means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.
>
> For physicians, "regular occupation" means your specialty in the practice of medicine which you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

(ECF No. 17-2 at PageID.141).

The Policy also provides that "[t]he lifetime cumulative maximum benefit period for all disabilities due to mental illness is 24 months." (ECF No. 17-2 at PageID.130). The Policy defines "mental illness" as follows:

> MENTAL ILLNESS means a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental Health Disorders (DSM), published by the American Psychiatric Association, most current as of the start of a disability. Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders, or disorders relatable to stress. If the DSM is discontinued or replaced, these disorders will be those classified in the diagnostic manual then used by the American Psychiatric Association as of the start of a disability.

ECF No. 17-2 at PageID.140).

II.        Examination of the Administrative Record

On April 15, 2013, Plaintiff, after having "a few drinks," "fell, struck his head, [but] did not lose consciousness." (ECF No. 17-4 at PageID.608-12). Plaintiff "did not think too

much of it," but awoke the following morning with "a severe headache, [which] seemed to get worse." (ECF No. 17-4 at PageID.608). When Plaintiff later spoke with his girlfriend, "she thought [Plaintiff] could have some suicidal ideation," at which point the "authorities were called" who "insisted that [Plaintiff] come to the Emergency Department." (ECF No. 17-4 at PageID.608).

A CT scan of Plaintiff's head revealed the presence of a "fairly sizeable acute subdural hematoma on the left side." (ECF No. 17-4 at PageID.608). Dr. Christopher Marquart thereafter performed "an uncomplicated craniotomy with coagulation of a torn bridging vein at the temporal tip [which] was the source of the subdural [hematoma]." (ECF No. 17-4 at PageID.606). A postoperative CT scan of Plaintiff's head revealed "excellent postoperative result without evidence of acute complicating process." (ECF No. 17-4 at PageID.613). Following this procedure, Plaintiff "gradually seemed to improve without any significant difficulties or problems." (ECF No. 17-4 at PageID.606). Plaintiff was discharged from the hospital on April 21, 2013. (ECF No. 17-4 at PageID.606).

On April 25, 2013, Plaintiff was examined by Dr. Marquart. (ECF No. 17-4 at PageID.604). The doctor reported that Plaintiff was "doing fairly well," should "slowly increase his activities," and would be able to return to work on May 21, 2013, with "no restrictions." (ECF No. 17-4 at PageID.604; ECF No. 17-11 at PageID.2396).

On May 30, 2013, Plaintiff was examined by Dr. A. James Potter. (ECF No. 17-12 at PageID.2575). Plaintiff reported that he was experiencing "hearing loss in the left ear." (ECF No. 17-12 at PageID.2575). An audiogram examination revealed "normal hearing on the right and a moderate sloping to severe mixed loss on the left." (ECF No. 17-12 at PageID.2575).

Plaintiff's left side hearing loss was "primarily high frequency hearing loss." (ECF No. 17-4 at PageID.602; ECF No. 17-12 at PageID.2575). The doctor also reported that Plaintiff "has excellent speech recognition bilaterally" and, moreover, that his "acoustic reflexes are intact." (ECF No. 17-12 at PageID.2575). A subsequent MRI examination of Plaintiff's auditory canal was "entirely normal." (ECF No. 17-4 at PageID.602-03; ECF No. 17-12 at PageID.2574-75).

On June 6, 2013, Plaintiff was examined by Dr. Marquart. (ECF No. 17-4 at PageID.602-03). The results of the examination were unremarkable and Plaintiff reported that "his biggest complaint is his hearing loss is bothering him." (ECF No. 17-4 at PageID.602-03). Dr. Marquart concluded that Plaintiff was "doing very well" and further noted that he was "back to work full time without any problems." (ECF No. 17-4 at PageID.602-03).

On June 18, 2013, Plaintiff began treating with Dr. Eric Sergent with the Michigan Ear Institute. (ECF No. 17-10 at PageID.2247-50). Plaintiff reported that he was experiencing hearing loss, tinnitus, "left aural fullness," and occasional sound distortion. (ECF No. 17-10 at PageID.2247). Plaintiff also reported that "he had some left hearing loss which preceded [his April 15, 2013] accident." (ECF No. 17-10 at PageID.2247). Plaintiff denied experiencing otalgia or otorrhea. (ECF No. 17-10 at PageID.2247). Plaintiff reported experiencing "some imbalance but no true vertigo, lightheadedness, or dizziness." (ECF No. 17-10 at PageID.2247).

The results of an audiogram examination revealed that the hearing in Plaintiff's right ear was within normal limits. (ECF No. 17-10 at PageID.2249). With respect to Plaintiff's left ear, the audiogram revealed CHL (conductive hearing loss) at low frequencies and SNHL (sensorineural hearing loss) at higher frequencies. (ECF No. 17-10 at PageID.2249).

Following examination and an exploratory surgery of Plaintiff's left middle ear

canal, Dr. Sergent diagnosed Plaintiff with left superior semicircular canal dehiscence (SSCD). (ECF No. 17-10 at PageID.2235-38, 2245-46, 2247-50). Dr. Sargent discussed with Plaintiff treatment options, including the use of hearing aids and surgical intervention. (ECF No. 17-10 at PageID.2249-50). Treatment notes dated August 5, 2013, indicate that Plaintiff was experiencing "imbalance," but "does not have true vertigo or lightheadedness." (ECF No. 17-10 at PageID.2235).

On August 19, 2013, Dr. Sergent performed surgery to repair Plaintiff's SSCD. (ECF No. 17-10 at PageID.2232-34). Treatment notes dated September 3, 2013, indicate that Plaintiff was still experiencing "severe symptoms of left ear recruitment and autophony, but no dizziness." (ECF No. 17-10 at PageID.2230-31). The doctor also reported that while Plaintiff reported that "he is very sensitive to noises, such as a shoe dropped," Plaintiff was "not bothered by his motorcycle." (ECF No. 17-10 at PageID.2230-31).

On September 15, 2013, Plaintiff texted his girlfriend, "I do not want to be here anymore, today is the day[.] I am done taking care of the dogs and I am gone." (ECF No. 17-10 at PageID.2165). Plaintiff's girlfriend contacted paramedics who subsequently discovered Plaintiff sitting in a corner of his closed garage with three vehicles running. (ECF No. 17-10 at PageID.2165). Plaintiff was transported to an emergency room where he denied drinking or "trying to hurt himself." (ECF No. 17-10 at PageID.2165). Blood testing revealed Plaintiff's blood alcohol level to be .180 and, based upon statements Plaintiff made to his girlfriend after arriving at the hospital, the emergency room doctor concluded that Plaintiff was "clearly very suicidal at this time" and "needs to be admitted" to a psychiatric facility. (ECF No. 17-10 at PageID.2166). Plaintiff was subsequently transferred to Forest View Psychiatric Hospital where

he was treated until September 26, 2013.   (ECF No. 17-7 at PageID.1393-1556; ECF No. 17-10 at PageID.2165-66).   Plaintiff was diagnosed as suffering from bi-polar disorder and alcohol dependence, both of which are identified in the DSM as mental illnesses.   (ECF No. 17-7 at PageID.1394).

On September 30, 2013, Plaintiff submitted a disability claim with Defendant alleging that he had been disabled since July 15, 2013.   (ECD No. 17-6 at PageID.1153-58).   On November 21, 2013, Defendant approved Plaintiff's disability claim, stating:

> We approved your benefits because you are unable to perform the duties required of an Anesthesiologist at this time based on the surgical procedures performed on April 16, 2013, July 15, 2013 and August 19, 2013, as well as your hospitalization due to depression in September 2013.

(ECF No. 17-6 at PageID.1337).

Defendant further informed Plaintiff that his "benefits will continue as long as [he] meet[s] the definition of disability in the policy provided by your employer and are otherwise eligible under the policy terms."   (ECF No. 17-6 at PageID.1337).   Defendant determined that Plaintiff's date of disability was April 16, 2013, with benefits first payable on September 20, 2013, due to the Policy's 90-day waiting period.   (ECF No. 17-7 at PageID.1339).   With respect to the Policy's limitations on benefits due to mental illness, Defendant stated the following:

> The policy provided by your employer limits your benefits to 24 months due to mental illness conditions including your medical condition of depression.   This means that if your medical records continue to support that you are unable to return to work due to this condition or any other mental illness, you will remain eligible to receive benefits for a maximum of 24 months based on depression or any mental illness.   This period will end on September 19, 2015.

(ECF No. 17-7 at PageID.1337, 1339).

On November 22, 2013, Plaintiff was examined by Dr. Potter.   (ECF No. 17-12 at

PageID.2573).  Plaintiff reported experiencing "dizziness during any activity that produces increased intracranial pressure" as well as "increased d[i]sequilibrium whenever he is fatigued." (ECF No. 17-12 at PageID.2573).  Plaintiff also reported that he continues to experience "a sensitivity to noises" as well as "significant autophony."  (ECF No. 17-12 at PageID.2573).  Dr. Potter concluded that Plaintiff was experiencing "persistent superior canal dehiscence."  (ECF No. 17-12 at PageID.2573).

A CT scan performed November 25, 2013, revealed that "despite interval surgery there remains dehiscence of the left superior semicircular canal."  (ECF No. 17-12 at PageID.2580).  This examination revealed "no [right-sided] abnormalities."  (ECF No. 17-12 at PageID.2580).  On January 22, 2014, Dr. Sargent performed a second surgery to attempt to repair Plaintiff's left-sided SSCD.  (ECF No. 17-13 at PageID.2812-14).  Treatment notes dated February 4, 2014, indicate that Plaintiff was not experiencing vertigo and "is very happy with his progress."  (ECF No. 17-4 at PageID.518).

On March 18, 2014, Plaintiff was transported to an emergency room after consuming alcohol and opiates.  (ECF No. 19-1 at PageID.5103-04).  Plaintiff expressed the desire to return to Forest View Psychiatric Hospital, but Forest View would not admit Plaintiff because he was "experiencing some withdrawal-type symptoms."  (ECF No. 19-1 at PageID.5103-04, 5109-10).  Plaintiff was discharged from the emergency room only to return several hours later claiming "he has been binge drinking."  (ECF No. 19-1 at PageID.5109-10).  Plaintiff was subsequently released to the care of his brother having indicated that he would "follow up with Pine Rest detox" later that morning.  (ECF No. 19-1 at PageID.5109-10).

On March 26, 2014, Plaintiff reported to Dr. Potter that he was continuing to

experience autophony and imbalance.   (ECF No. 17-12 at PageID.2570).   Treatment notes dated March 27, 2014, indicate that Plaintiff was suffering "alcohol abuse – recurrent; binging," for which Plaintiff required "longterm 1:1 counseling."   (ECF No. 18-9 at PageID.4663).   It was further noted that Plaintiff was experiencing "anxiety" for which he "needs psychiatry."   (ECF No. 18-9 at PageID.4663).   On April 1, 2014, Plaintiff reported to Dr. Sargent that he was experiencing "instability," but not vertigo, when exposed to "loud sound."   (ECF No. 17-4 at PageID.526).

On April 17, 2014, Plaintiff "had an argument" with his girlfriend during which Plaintiff made comments which caused his girlfriend to become concerned for Plaintiff's safety. (ECF No. 17-10 at PageID.2161).   Plaintiff's girlfriend telephoned the police who proceeded to Plaintiff's residence "to check on him."   (ECF No. 17-10 at PageID.2161).   When the police arrived, Plaintiff was "very tearful" and "having some suicidal thoughts as he does chronically." (ECF No. 17-10 at PageID.2161).   Plaintiff stated that he "has been drinking alcohol."   (ECF No. 17-10 at PageID.2161).   Plaintiff was transported to an emergency room for further evaluation. (ECF No. 17-10 at PageID.2161).   Plaintiff's blood alcohol level was .174 and a drug screen was negative.   (ECF No. 17-10 at PageID.2163).   When his blood alcohol level diminished, Plaintiff denied any suicidal ideation and insisted that "he simply was drunk and depressed."   (ECF No. 17-10 at PageID.2163).   The hospital acceded to Plaintiff's request that, since he was now sober, he be discharged so that he could "follow up with his psychiatrist at Pine Rest."   (ECF No. 17-10 at PageID.2163).

On April 22, 2014, Plaintiff met with Dr. Julie Arellano for a psychiatric evaluation. (ECF No. 18-10 at PageID.4811-18).   Plaintiff was diagnosed with: (1) major depressive disorder,

recurrent, severe, without psychotic features; (2) alcohol dependence; and (3) adjustment disorder with anxiety, all of which are identified in the DSM as mental illnesses. (ECF No. 18-10 at PageID.4817).

On April 23, 2014, Dr. Sargent performed another operative procedure in an attempt to treat Plaintiff's SSCD. (ECF No. 17-4 at PageID.586-88). On May 6, 2014, Plaintiff reported that he was still experiencing "dizziness/unsteadiness with loud sounds." (ECF No. 17-4 at PageID.589).

Counseling treatment notes dated May 7, 2014, indicate that Plaintiff considered himself a "functional alcoholic for much of his career." (ECF No. 18-2 at PageID.3387). Plaintiff further noted, however, that his alcohol consumption has increased over the past several years "and, at times, been out of control." (ECF No. 18-2 at PageID.3387). Plaintiff further reported that despite being diagnosed with bi-polar disorder during his September 2013 hospitalization, he had stopped taking his prescribed medication "due to [its] effect on his thinking." (ECF No. 18-2 at PageID.3387). Counseling treatment notes dated May 13, 2014, indicate that Plaintiff "currently shows signs of depression, anxiety, poor judgment, and substance dependence." (ECF No. 18-2 at PageID.3405).

On May 22, 2014, Plaintiff's daughter "found [Plaintiff] at home with a significantly depressed level of consciousness for which EMS was summoned." (ECF No. 17-10 at PageID.2158). Plaintiff's daughter reported to EMS that "this happens quite frequently with [Plaintiff] and [she] did not seem to be overall overly concerned about the situation." (ECF No. 17-10 at PageID.2158). After arrival at the hospital, Plaintiff's blood alcohol level was determined to be .496. (ECF No. 17-10 at PageID.2160). Plaintiff was treated for acute alcohol

intoxication and monitored until his blood alcohol level diminished at which point Plaintiff expressed the desire to return home. (ECF No. 17-10 at PageID.2155-60). After it was determined that Plaintiff was not harboring any suicidal thoughts, he was discharged to the care of his girlfriend. (ECF No. 17-10 at PageID.2155-60).

Counseling treatment notes dated May 30, 2014, indicate that Plaintiff continued to suffer from (1) major depressive disorder, recurrent, severe, without psychotic features; (2) alcohol dependence; and (3) adjustment disorder with anxiety. (ECF No. 17-14 at PageID.2969). Counseling treatment notes dated July 9, 2014, indicate that Plaintiff "was discharged from detox almost a week ago." (ECF No. 17-14 at PageID.2972). Plaintiff reported having "a great experience at Pine Rest," indicating that "he has never had that kind of experience before in the multiple times that he has been to detox or substance abuse treatment." (ECF No. 17-14 at PageID.2972). The doctor observed that Plaintiff exhibited "improved" insight and that "no psychosis or manic symptoms were evident." (ECF No. 17-14 at PageID.2972-73).

On July 13, 2014, Plaintiff reported to Dr. Sargent that his "balance has improved," but that he "remains unreliable." (ECF No. 17-8 at PageID.1737). Plaintiff also reported experiencing "auditory hypersensitivity" and "continued dizziness/unsteadiness with loud noises." (ECF No. 17-8 at PageID.1737). In response, the doctor instructed Plaintiff to simply "wear an earplug in noisy situations." (ECF No. 17-8 at PageID.1738). Plaintiff was also instructed to "schedule a Hearing Aid Evaluation with Dr. Potter's office." (ECF No. 17-8 at PageID.1738). There is also no indication in the record that Plaintiff complied, or attempted to comply, with Dr. Sargent's instructions. Plaintiff did not treat with Dr. Sargent after this date. (ECF No. 17-8 at PageID.1738).

On July 22, 2014, Dr. Sargent responded to a request by Defendant for information regarding Plaintiff's disability claim by asserting, without explanation, that Plaintiff "is disabled." (ECF No. 17-10 at 2219-20).

Counseling treatment notes dated July 23, 2014, indicate that Plaintiff was continuing to experience "cravings" for alcohol, but his medication "has been helping him stay sober." (ECF No. 17-14 at PageID.2981). On July 30, 2014, Plaintiff reported that he had not taken action toward obtaining a hearing aid. (ECF No. 17-8 at PageID.1745). Plaintiff also reported that he was working with a personal trainer 2-3 times weekly. (ECF No. 17-8 at PageID.1745).

On August 16, 2014, Plaintiff participated in a CT scan of his head, the results of which revealed: (1) no acute intracranial abnormality; (2) no evidence of recurrent subdural hematoma; and (3) stable postsurgical changes from previous craniotomy. (ECF No. 19-2 at PageID.5273).

On August 19, 2014, Plaintiff submitted a claim to the Social Security Administration for Disability Insurance Benefits. (ECF No. 19-2 at PageID.5307). Plaintiff reported that he was disabled due to: (1) SSCD; (2) hearing loss; and (3) depression. (ECF No. 17-10 at PageID.2104). The Social Security Administration subsequently concluded that Plaintiff was disabled due to affective disorders and hearing loss. (ECF No. 19-2 at PageID.5307).

On August 22, 2014, Plaintiff reported to Dr. Arellano that he had recently taken a "trip on his motorcycle" to Indianapolis. (ECF No. 17-11 at PageID.2386; ECF No. 19-1 at PageID.5009). Plaintiff also reported that "he has been more depressed in the last few weeks" because fall reminds him "of when he used to leave his mother when he went to school and felt

unaccepted in school because of their financial status."   (ECF No. 17-11 at PageID.2386).

On October 6, 2014, Plaintiff reported that he continues to regularly ride motorcycles.   (ECF No. 18-5 at PageID.3774).   Counseling treatment notes dated October 10, 2014, indicate that Plaintiff reported that he was "growing spiritually" and "feels supported by the universe" and "closer to his higher power."   (ECF No. 18-10 at PageID.4865).   Plaintiff also reported that he unilaterally decided to stop taking Naltrexone because "he did not have cravings [for alcohol] anymore and didn't think he needed it."   (ECF No. 18-10 at PageID.4865).   Dr. Arellano indicated that Plaintiff was still suffering from: (1) major depressive disorder, recurrent, severe, without psychotic features; (2) alcohol dependence, in "early remission post detox"; and (3) adjustment disorder with anxiety.   (ECF No. 18-10 at PageID.4871).

Counseling treatment notes dated November 6, 2014, indicate that Plaintiff "relapsed after meeting with his daughter for his birthday."[2]   (ECF No. 18-10 at PageID.4877).   Plaintiff acknowledged that "he was starting to slack off on the work he used to do for his sobriety and hopes this is a lesson for him to stay on track."   (ECF No. 18-10 at PageID.4877).   Counseling treatment notes dated December 12, 2014, indicate that Plaintiff's mood "improved on higher dose of Cymbalta."   (ECF No. 18-10 at PageID.4889).   Plaintiff reported that when he accidentally took a lower dose, "he could feel the difference[, his] mood was down and [he was] more irritable."   (ECF No. 18-10 at PageID.4889).

On December 16, 2014, Plaintiff purchased a road touring motorcycle weighing almost 500 pounds.   (ECF No. 19-4 at PageID.5521).

Counseling treatment notes dated March 13, 2015, indicate that Plaintiff again

---

[2] Plaintiff's birthday is October 10.   (ECF No. 19-2 at PageID.5307).

stopped taking Naltrexone because he was no longer experiencing alcohol cravings. (ECF No. 18-10 at PageID.4898). Plaintiff reported that he was recently awarded disability benefits "for mental illness," but nevertheless complained that "he was disabled for medical reasons" and not because he suffered from mental illness. (ECF No. 18-10 at PageID.4899). Plaintiff also reported that he stopped taking Cymbalta because he "does not feel the need" for such medication. (ECF No. 18-10 at PageID.4898).

Counseling treatment notes dated May 8, 2015, indicate that Plaintiff recently "felt down" and "thought about drinking alcohol." (ECF No. 18-10 at PageID.4912). Plaintiff reported "7 months sobriety – the longest he has been without a substance to manage his depression." (ECF No. 18-10 at PageID.4912). Dr. Arellano questioned "whether [Plaintiff's] pattern of starting and stopping medications is related to [Plaintiff's] need for control." (ECF No. 18-10 at PageID.4913). The doctor reported that Plaintiff was experiencing "mild depression and anxiety," but "continues to prefer psychotherapy over medications." (ECF No. 18-10 at PageID.4919).

On July 22, 2015, Dr. Gerard Gianoli, of the Ear and Balance Institute, located in Covington, Louisiana, conducted an independent review of Plaintiff's medical records. (ECF No. 18-7 at PageID.4070-74). The doctor summarized his observations and conclusions as follows:

> In summary, Dr. O'Neill appears to have suffered a subdural hematoma and has had a symptomatic left superior semicircular canal syndrome since then. He has subjective complaints of hearing loss, which are objectively documented on his audiometry. He has subjective complaints of imbalance, which are not objectively documented in any particular testing. He has the subjective complaint of Tullio's phenomenon (sound-induced vertigo and disequilibrium) that can partially be corroborated with the abnormal VEMP testing that was done at the onset of his

14

evaluation back in August 2013. This showed improvement with the testing done in March 2014.

(ECF No. 18-7 at PageID.4073).

Dr. Gianoli further observed:

There is no documentation that Dr. O'Neill reports vertigo in any office visit in the records provided to me. He reports imbalance only. The preoperative VEMP demonstrating a threshold of 55 dB in the left ear is strongly suggestive of a symptomatic superior canal dehiscence on that side. However, the improved results on the March 31 VEMP suggest that this has significantly improved. There is a loose correlation between VEMP results and Tullio's phenomenon. This does not exclude the possibility of continued noise intolerance, hypacusis or continued Tullio's phenomenon, but it does suggest that these symptoms have likely improved with his surgical interventions.

(ECF No. 18-7 at PageID.4073-74).

Regarding Dr. Sargent's recommendation that Plaintiff "use an ear plug in his left ear and a hearing aid in the right ear," Dr. Gianoli considered such to constitute "very reasonable accommodations to prevent Tullio's phenomenon and improve communication." (ECF No. 18-7 at PageID.4074). The doctor noted that "a CROS [hearing] aid would be of particular benefit in this situation." (ECF No. 18-7 at PageID.4074). The doctor continued, noting that "[g]iven that [Plaintiff] does not have any debilitating vestibular symptoms other than Tullio's phenomenon, this should alleviate this problem and allow [Plaintiff] to return to work." (ECF No. 18-7 at PageID.4074). Accordingly, Dr. Gianoli concluded that Plaintiff was capable of working as an anesthesiologist. (ECF No. 18-7 at PageID.4073-74, 4186-87).

On August 26, 2015, Plaintiff purchased a sport motorcycle weighing more than 400 pounds. (ECF No. 17-5 at PageID.1060).

On October 28, 2015, Defendant notified Plaintiff that it was terminating Plaintiff's

15

disability benefits. (ECF No. 17-4 at PageID.748-58). Specifically, Defendant relied on the Policy provision, noted above, which provides for a maximum of twenty-four (24) months of benefits for disability due to mental illness. (ECF No. 17-4 at PageID.748-58). In support of its decision, Defendant noted Plaintiff's medical history, as well as the fact that Plaintiff was presently receiving disability benefits under a separate policy, issued by another organization, pursuant to a diagnosis of bi-polar disorder. (ECF No. 17-4 at PageID.748-58). Plaintiff appealed this determination. (ECF No. 17-5 at PageID.1070).

On December 28, 2015, Plaintiff purchased an off-road motorcycle weighing more than 300 pounds. (ECF No. 19-4 at PageID.5520).

On February 5, 2016, Plaintiff participated in a vocational rehabilitation evaluation conducted by Rehabilitation Consultant, Robert Ancell, Ph.D. (ECF No. 18-9 at PageID.4532-52). With respect to his activities, Plaintiff reported that "[h]e is involved in an exercise program and maintenance of his home." (ECF No. 18-9 at PageID.4533). Plaintiff also reported that he rides his motorcycle and drives his "sports car" on "high performance courses." (ECF No. 18-9 at PageID.4533). Dr. Ancell also noted that Plaintiff's medical history was "positive for depression, bipolar and ETOH abuse." (ECF No. 18-9 at PageID.4533).

After reviewing Plaintiff's medical record, as well as information regarding Plaintiff's profession, Dr. Ancell concluded that, "[i]n the real world of anesthesiology that [Plaintiff] practiced in, which was a Level II Trauma Center, [Plaintiff] would be totally unable to perform the substantial portions of his job." (ECF No. 18-9 at PageID.4551). For two reasons, the Court affords little weight to Dr. Ancell's opinion.

First, as previously noted, to obtain disability benefits under the Policy, Plaintiff

must establish that he can no longer perform his "regular occupation" as such is performed "in the national economy" rather than how such is performed for any particular employer. Thus, whether Plaintiff can return to his previous position as an anesthesiologist in the specialized and stressful environment of a Level II trauma center is only marginally relevant to the question whether Plaintiff is no longer able to perform his "regular occupation" as such is defined by the Policy.

Second, Dr. Ancell's conclusions regarding Plaintiff's alleged inability to work in an environment with a certain noise level is little more than speculation given Plaintiff's refusal to even attempt the suggestion proffered by Dr. Sargent, and others, that Plaintiff plug his left ear and wear a hearing aid in his right ear. As Dr. Gianoli concluded, such would constitute a reasonable accommodation that would permit Plaintiff to continue working. Plaintiff's refusal to even attempt such undercuts any argument that he is unable to work in certain environments due to noise considerations. Dr. Ancell's opinion is further undercut by Plaintiff's admission that he continues to ride motorcycles and engages in "high performance" sports car driving.

On April 14, 2016, Plaintiff participated in a forensic psychological examination conducted by Dr. Steven Harris. (ECF No. 19-2 at PageID.5296-99). The results of a mental status examination were unremarkable with no evidence of "dysphoric mood." (ECF No. 19-2 at PageID.5298). Dr. Harris concluded that while Plaintiff "does in fact suffer from alcohol dependence and major depression, recurrent," such are "chronic and are not, nor have they ever been, disabling conditions." (ECF No. 19-2 at PageID.5299). The doctor further concluded:

> A diagnosis of a major affective disorder such as bipolar, cannot be established when mood lability is a function of his intoxication and alcohol dependent lifestyle. Once stabilized, as is the case presently, there is no evidence to establish either a bipolar disorder or major depression. It is also noteworthy that [Plaintiff] is currently taking no psychotropic medications, and hasn't for a

17

> prolonged period of time, thereby negating a re-compensated emotional status as a consequence of pharmacotherapy. He is deriving significant benefit from his outpatient psychotherapy program in assisting his adjustment to disability, and recovery from alcohol.

(ECF No. 19-2 at PageID.5299).

The Court affords little weight to Dr. Harris' opinion. First, the doctor appears to have only examined Plaintiff on a single occasion, thus he possesses no long-term treating relationship with Plaintiff which might afford the doctor increased insight into Plaintiff's circumstance. Second, Dr. Harris did not examine Plaintiff until almost three years after the events which precipitated Plaintiff's disability claim and more than six months after Defendant discontinued Plaintiff's disability benefits by invoking the Policy's time limit on disability benefits due to mental illness. Simply put, whether Plaintiff was disabled by a mental illness as of April 2016, is only marginally relevant.

As for Dr. Harris' opinion that Plaintiff's emotional impairments never rendered Plaintiff incapable of working, such simply flies in the face of the extensive evidence of record to the contrary. While Dr. Harris' observation that a person can suffer from mental illness that imposes less than disabling limitations is accurate, and may very well have been the case with Plaintiff for much of his working life, the evidence of record indisputably reveals that for a significant period of time following his April 2013 incident, Plaintiff's long-standing emotional impairments did, in fact, limit Plaintiff to a disabling degree. Dr. Harris' attempt to diminish Plaintiff's depression and anxiety on the ground that such were precipitated by Plaintiff's alcoholism is not persuasive as alcoholism, like depression and anxiety, is listed in the DSM as a mental illness.

On July 27, 2016, Dr. Daniel Lee, Associate Professor of Otology and Laryngology

at Harvard Medical School, conducted an independent review of Plaintiff's medical records. (ECF No. 19-4 at PageID.5672-79).   Dr. Lee concluded that "using a musician's plug that can help to filter and diminish some of the more intense sounds around him or an occlusive earplug can be helpful to mitigate some of [Plaintiff's] sound evoked symptoms" even those occurring in "a louder work environment e.g. a noisy operating room."   (ECF No. 19-4 at PageID.5678).

On August 11, 2016, Defendant denied Plaintiff's appeal of its previous decision to limit his disability benefits to twenty-four months on the ground that Plaintiff's disability was due to mental illness.   (ECF No. 17-5 at PageID.1070-81).

Plaintiff's argument that he is entitled to disability benefits due to an on-going *physical* disability is fatally undermined by two things documented in the administrative record. First, Plaintiff refused to even attempt a reasonable treatment to lessen or alleviate his alleged vestibular symptoms.   Dr. Gianoli, Dr. Lee, and even Plaintiff's treating physician, Dr. Sargent, all concluded that Plaintiff could diminish his alleged vestibular symptoms by simply wearing an earplug in his left ear and a hearing aid in his right ear.   Plaintiff's refusal to even attempt this treatment severely undercuts Plaintiff's credibility and calls into question the veracity of Plaintiff's alleged symptoms.   This conclusion is strengthened by Plaintiff's continued motorcycle riding and "high performance" sports car driving, activities which are simply inconsistent with Plaintiff's assertion that he is disabled due to balance difficulties and inability to be exposed to loud noises.

Simply put, in the aftermath of his April 2013 head injury, Plaintiff's longstanding alcohol dependence and depression/anxiety increased to disabling levels, as evidenced by his subsequent suicidal conduct, increased alcohol consumption, and psychiatric hospitalizations and on-going mental health treatment.   Plaintiff's arguments to diminish, if not altogether ignore, his

severe emotional impairments are unpersuasive.

For example, Plaintiff argues that Defendant was somehow precluded from finding him disabled due to mental illness because it did not have him examined by a mental health professional. First, the medical record detailed above so clearly reveals that Plaintiff was disabled following his April 2013 accident due to mental illness that obtaining an expert opinion on such hardly seems necessary. Moreover, even if the Court assumes that this argument has merit, Plaintiff was still required to demonstrate that, following his initial 24 months of benefits, he was disabled due to a physical impairment which he has failed to accomplish.

Plaintiff also places great weight on the Social Security Administration's subsequent re-characterization of his disabling impairments. After being awarded disability benefits by the Social Security Administration on the ground that he was disabled due to affective disorders and hearing loss, Plaintiff submitted an unopposed request to the Social Security Administration to modify the basis of his disability. (ECF No. 19-4 at PageID.5580-82). Specifically, Plaintiff was upset that the Social Security Administration had deemed him disabled due to his serious emotional impairments which are well documented in the record. Nevertheless, the Social Security Administration acquiesced to Plaintiff's request, issuing a modified determination indicating that Plaintiff was instead disabled due to vertigo[3] and other disorders of the vestibular system. (ECF No. 19-2 at PageID.5309). The Court places little significance on this occurrence.

First, the argument that Plaintiff was not disabled due to emotional impairments is simply contradicted by the evidence of record. Next, it is well settled that "an ERISA

---

[3] The Court notes that the record clearly reveals that Plaintiff does not experience vertigo, thus further diminishing the weight and persuasiveness of this determination.

administrator plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan." *Whitaker v. Hartford Life and Accident Ins. Co.*, 404 F3d 947, 949 (6th Cir. 2005). As courts recognize, ERISA and the Social Security disability program articulate distinct regulatory schemes applying very different standards. As but one example, "Social Security determinations follow a highly deferential 'treating physician rule' that does not apply in ERISA cases." *Kiel v. Life Ins. Co. of North America*, 345 Fed. Appx. 52, 57 (6th Cir., Aug. 20, 2009) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832-33 (2003)). Finally, the label or characterization which Plaintiff seeks to apply to his impairments is of limited relevance. Otherwise, a claimant could avoid certain policy limitations, simply by choosing to re-characterize his disability.

Finally, Plaintiff seeks to invalidate the opinions and observations by Dr. Gianoli and Dr. Lee on the ground that neither doctor actually examined Plaintiff. The Court is not persuaded. Following its initial disability determination, Defendant sought to have Plaintiff examined by a certified neurotologist. This was not an easy task as there are less than 200 such professionals in the country. (ECF No. 19-4 at PageID.5584). Defendant initially contacted Dr. H. Alexander Arts, a Professor at the University of Michigan Medical Center. (ECF No. 18-6 at PageID.3920-21). Dr. Arts initially agreed to examine Plaintiff, but subsequently declined due to scheduling difficulties. (ECF No. 18-7 at PageID.4003, 4005).

Defendant then arranged for Plaintiff to be examined by Dr. Andrew Fishman. (ECF No. 18-6 at PageID.3955). The examination was scheduled to take place at the Northwestern Medicine Central DuPage Hospital, Cadence Neurosciences Institute, in Winfield,

Illinois.[4]   (ECF No. 18-6 at PageID.3955).   Plaintiff refused to attend this examination, however, instructing Defendant to instead "locate a doctor in the West Michigan area."   (ECF No. 18-6 at PageID.3991).

Plaintiff asserts that his "condition would not permit him to make the four-hour trip to Winfield."   (ECF No. 25 at PageID.5731).   The Court notes, however, that only a few months prior Plaintiff rode his motorcycle to and from Indianapolis, Indiana, which is located further from Muskegon, Michigan, than Winfield, Illinois.   Nevertheless, Defendant arranged for Dr. Fishman to travel to Muskegon to perform his examination of Plaintiff.   (ECF No. 18-7 at PageID.4005-06, 4013-14).   Prior to this examination, however, Plaintiff indicated that he would be recording the examination.   (ECF No. 18-7 at PageID.4022, 4025).   While Defendant did not object to the examination being recorded, Dr. Fishman objected and declined to examine Plaintiff.   (ECF No. 18-7 at PageID.4035).   Given Defendant's inability to locate another neurotologist willing to travel to Muskegon to examine Plaintiff, and be recorded doing so, Plaintiff agreed to "a paper IME [independent medical examination]."   (ECF No. 18-7 at PageID.4035).

Plaintiff has identified no authority which obligated Defendant to secure an in-person IME of Plaintiff.   While the Policy provides that Defendant "may require" Plaintiff to participate in an in-person physical examination, the Policy neither mandates such nor precludes Defendant from seeking the type of medical record review that occurred in this case.   *See, e.g., Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) (where policy language neither mandated an in-person examination nor precluded a medical record review, court declined to read such requirements into the policy).   Even if the Policy required Plaintiff to be examined in person,

[4] Winfield, Illinois is located approximately 35 miles due west of downtown Chicago, Illinois.   Plaintiff asserts that Winfield, Illinois, is located 244 miles from his home in Muskegon, Michigan.   (ECF No. 18-6 at PageID.3991).

Plaintiff waived any such obligation by Defendant by agreeing to "a paper IME." The Court, likewise, rejects any argument by Plaintiff that Dr. Gianoli or Dr. Lee were unfairly biased. There is nothing in the record indicating that either doctor had any previous relationship with Defendant, or any similar entity, which might suggest potential for bias.

Finally, it must be noted that Defendant's inability to secure an in-person IME of Plaintiff, is wholly attributable to Plaintiff's refusal to travel for such, despite being fully able to undertake a motorcycle trip covering several hundred miles, as well as his insistence that any such examination be recorded despite articulating no reasonable grounds for requesting such. *See, e.g., Torres v. Time Manufacturing Company*, 2012 WL 13006155 at *3 (E.D. Mich., Mar. 23, 2012) (unless party demonstrates "special need" or "good reason," recording of an IME not appropriate); *Waller v. Lovingier*, 2016 WL 1426920 at *3 (D. Colo., Apr. 12, 2016) (absent "exceptional circumstances," recording of IME not permitted); *In re Welding Fume Products Liability Litigation*, 2010 WL 7699456 at *82 n.309 (N.D. Ohio, June 4, 2010) (good cause, sufficient to warrant recording of an IME, is not established by mere fact that the examining physician was selected by the opposing party).

To the extent that there exists a conflict between Dr. Sargent's conclusory opinion that Plaintiff "is disabled" and the opinions by Dr. Gianoli and Dr. Lee that Plaintiff's vestibular symptoms would be alleviated by simply wearing a plug in his left ear and, if necessary, a hearing aid in his right ear, the Court finds the opinions by Dr. Gianoli and Dr. Lee deserving of greater weight. Despite specifically being asked to articulate Plaintiff's "restrictions" and "limitations," Dr. Sergent merely stated the conclusion that Plaintiff "is disabled." (ECF No. 17-10 at 2219-20). Dr. Sargent's conclusion that Plaintiff "is disabled" is inconsistent with Plaintiff's reported

activities. Furthermore, the doctor failed to articulate why his recent advice to Plaintiff to simply "wear an earplug in noisy situations," was insufficient to minimize Plaintiff's alleged vestibular symptoms. On the other hand, Dr. Gianoli and Dr. Lee offered the opinion that Plaintiff's vestibular symptoms would be alleviated through use of an ear plug, a recommendation which Plaintiff refused to even attempt.

## CONCLUSION

For the reasons articulated herein, the Court finds that Defendant's decision to discontinue Plaintiff's disability benefits after 24 months was consistent with the Policy and supported by the administrative record. Plaintiff has failed to meet his burden to establish entitlement to disability benefits beyond the 24-month period of benefits he was awarded. Accordingly, Plaintiff's challenge to Defendant's decision denying his claim for disability benefits is denied and this action terminated. An Order consistent with this Opinion will enter.


Date: March 19, 2018                                    /s/ Ellen S. Carmody
                                                        ELLEN S. CARMODY
                                                        United States Magistrate Judge